IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| ALBERT A.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 3:21-cv-00009 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:    Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Albert A., proceeding pro se, asks this Court to review the Commissioner of

Social Security's final decision denying his application for disability insurance benefits ("DIB")

under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before

me by the parties' consent under 28 U.S.C. § 636(c)(1). ECF No. 16. Having considered the

administrative record, the parties' filings, and the applicable law, I find that the Commissioner's

decision is supported by substantial evidence. Accordingly, I will affirm the decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. *See* 42
U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Albert applied for DIB in June 2019. Administrative Record ("R.") 167–68. He alleged that he became disabled on March 1, 2015, R. 167, because of throat surgery, obesity, chronic obstructive pulmonary disease ("COPD"), anxiety, sleep apnea, lower back pain, and foot pain, R. 186. Disability Determination Services ("DDS"), the state agency, denied his claim initially in August 2019, R. 52, 54–59, and upon reconsideration that October, R. 60, 62–68. In July 2020, Albert appeared with a non-attorney representative and testified at an administrative hearing before ALJ H. Munday. *See* R. 30–51. At the hearing, Albert's representative moved to amend his alleged onset date ("AOD") to July 6, 2018, R. 35–36, and ALJ Munday granted the motion, R. 36. On his amended alleged onset date, Albert was fifty years old, or a "person closely approaching advanced age" under the regulations. *See* R. 35–36; 20 C.F.R. § 404.1563(d). A vocational expert ("VE") also testified at the hearing. *See* R. 46–50.

ALJ Munday issued an unfavorable decision on July 28, 2020. *See* R. 19–25. She found that Albert met the insured status requirements of the Act through September 30, 2018,[4] and that

---

[4] This represents Albert's "date last insured" or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 377, 341 (4th Cir. 2012). "To qualify for DIB, [Albert] must prove that [he] became disabled prior to the expiration of [his] insured status." *Johnson*, 434 F.3d at 655–56.

he had not engaged in substantial gainful activity from March 15, 2015, through September 30, 2018. R. 21. Albert had medically determinable impairments of "obesity, supraglottic edema/airway obstruction status post 2016 surgeries, [COPD], hypertension, and obstructive sleep apnea." R. 21. Albert's degenerative disc disease, mild left acromioclavicular joint impairments, anxiety, and depression were not medically determinable impairments, R. 21, because "the existence of th[o]se impairments ha[d] not been shown by the appropriate medical evidence that [could] relate back to the period prior to [Albert's] date last insured." R. 22. None of Albert's medically determinable impairments were "severe" because they did not significantly limit Albert's ability to perform basic work activities for twelve consecutive months during the relevant period. *Id.* Thus, ALJ Munday concluded that Albert was "not disabled" from July 6, 2018, his amended alleged onset date, through September 30, 2018, his date last insured. R. 25. The Appeals Council declined review, R. 2–8, and this appeal followed.

### III. Discussion

Liberally construing Albert's pleadings, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), he challenges the ALJ's finding that he did not suffer from any "severe" impairments during the relevant period. *See* Compl., ECF No. 1; Pl.'s Br., ECF No. 14; *see also* Pl.'s Supp'l Br., ECF No. 17. Albert additionally contends that the ALJ failed to consider whether post-DLI evidence related back to the relevant period. *See* Pl.'s Supp'l Br 1.

Even construing his briefing liberally, Albert has not identified a reversible error in ALJ Munday's decision. To start, the question in this case is not whether Albert is disabled, or even whether ALJ Munday should have found him to be disabled. Rather, the question is whether ALJ Munday's conclusion that Albert was "*not* disabled is supported by substantial evidence and reached based upon a correct application of the relevant law." *Craig v. Chater*, 76 F.3d 585, 589

4

(4th Cir. 1996) (emphasis added). This means the Court's role is limited to ensuring that the ALJ "applied [the] correct legal standards and [her] factual findings are supported by substantial evidence" in the record. *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015) (noting that "a reviewing court must uphold the [Commissioner's] determination when" the ALJ's decision meets both criteria). ALJ Munday's decision satisfies this "deferential" standard of review, *Jarvis v. Berryhill*, 697 F. App'x 251, 251 (4th Cir. 2017).

The ALJ properly considered Albert's condition during the relevant period—from July 6, 2018, through September 30, 2018—in evaluating his claim. And, although the record demonstrates that Albert experienced problems with shortness of breath and underwent surgeries in early 2016, *see* R. 340–41, 362–63, 373, and that he experienced additional medical problems after January 2019, *see* R. 279–82 (shortness of breath, swelling in legs); R. 270 (COPD); R. 566 (severe obstructive sleep apnea); R. 464 (hypertension, anxiety, COPD); R. 448 (hypertension, lumbar pain, left shoulder pain), the record does not contain any evidence, aside from Albert's own subjective statements, to support a finding that he suffered from a "severe" impairment during the relevant period. Moreover, the ALJ's analysis of Albert's subjective statements is legally adequate and supported by substantial evidence.

A.    *Summary*

1.    *Relevant Medical Evidence*

In January 2016, prior to his amended alleged onset date, Albert reported difficult breathing. R. 376. On January 25, a flexible laryngoscopy revealed diffuse edema and erythema. R. 375. That day, Albert was admitted to UVA Medical Center for possible airway obstruction. R. 349–51. He underwent a tracheostomy the next day. R. 362–63. A flexible laryngoscopy and tracheoscopy performed a few days later demonstrated improved patency in his airway, but he

had residual supraglottic edema, and "[t]he airway was 70% obstructed secondary to supraglottic edema and redundant tissue." R. 343. Daniel Peters, M.D., noted evidence of an upper airway infection on Albert's tracheoscopy and prescribed Augmentin, and he recommended that Albert undergo a microlaryngoscopy with $CO_2$ laser excision of supraglottic tissue and steroid injection. R. 343. Albert underwent the procedure on February 25, *see* R. 340–41, and his post-operative diagnoses were supraglottis stenosis, glottic stenosis, and tracheostomy dependence, R. 340.

By March, Albert was "doing great" with no trouble breathing, his voice was improved, and he had no trouble swallowing. R. 335. Exam findings were unremarkable, and a flexible laryngoscopy showed that Albert's supraglottic edema was "significantly improved." *Id.*; *see also* R. 334. In June, Albert reported he was "doing well," had returned to  work, had several upcoming construction jobs, and had "not been limited at work by shortness of breath." R. 332. He denied changes in his voice and dysphagia and had decreased the amount he was smoking. *Id.* A flexible laryngoscopy with videostroboscopy showed "mild" residual edema in the epiglottis and "moderate" excess tissue in the aryepiglottic folds, arytenoids, and false vocal cords. *Id.* In his assessment, Dr. Peters noted these findings to be "not obstructive." R. 333. He assessed supraglottic airway obstruction, dysphonia flexible stroboscopy, and tobacco abuse, and he ordered Albert to follow up in six months. *Id.* In December, Albert was still "doing well," and he had returned to working construction and was not limited by shortness of breath. R. 331. His flexible laryngoscopy with videostroboscopy revealed "moderate" excess tissue in the aryepiglottic folds, arytenoids, and false vocal cords, and "mild" scattered white plaques in the vocal cords." *Id.* James J. Daniero, M.D., noted these findings were not obstructive, and he ordered Albert to follow up in six months. *Id.*

At his June 2017 follow-up appointment, Albert's voice was "severely" rough and he had "mild" tachycardia on exam. R. 329. He had "some redundant areas in the posterior larynx in the area of the arytenoid that prolapsed into the airway with inspiration," but this was "nonobstructive in nature." R. 330. He had "markedly improved" from his pre-operative status and expressed no shortness of breath. *Id.* Dr. Daniero advised him to follow up in one year and to drink more water and less caffeine to improve his voice quality. *Id.*

The record does not document that Albert received any treatment from June 2017 to January 31, 2019, which covers the entire period from his amended alleged disability onset to the expiration of his disability insured status.

After his DLI, however, the record shows that Albert received treatment for several medical issues. In January 2019, he reported trouble sleeping and knee pain, and Jessica James, D.O., assessed snoring, apnea, obesity, restless legs, and acute pain of the left knee, R. 286–87. An X-ray of his left knee revealed "moderate" suprapatellar joint effusion with no acute fracture or dislocation. R. 286, 307–08. Dr. James recommended that Albert ice his knee and take ibuprofen. *Id.* In February, he reported shortness of breath and dyspnea on exertion, saying that he had experienced shortness of breath all his life and that it had increased since his throat surgery. R. 283. He also complained of swelling in his legs. *Id.* Exam findings showed normal breathing and 3+ bilateral lower extremity edema. R. 285. In April, Albert again complained of dyspnea since his tracheostomy, R. 279, and exam showed 3+ bilateral lower extremity edema, R. 281–82. Dr. James assessed dyspnea on exertion, which she said was likely COPD from Albert's lengthy history of smoking, and she ordered pulmonary function testing and started Albert on Albuterol. R. 279; *see also* R. 297 (chest X-ray revealing "[n]o evidence for acute cardiopulmonary process"). In May, Albert said he had experienced loud snoring, breathing

pauses, gasping or choking sensations, and restless legs during his sleep for years that were more noticeable over the past twelve months. R. 275. Exam showed erythematous uvula and peri-tonsillar areas, but otherwise was mostly normal, R. 277, and Elizabeth Foreman, M.D., assessed sleep apnea and recommended an overnight sleep study. R. 274; *see also* R. 566 (sleep apnea shows "very severe" obstructive sleep apnea, Albert given CPAP machine) (June 25, 2019).

Albert underwent pulmonary function testing in May that revealed a "combined obstructive and respiratory defect" that was "severe," but showed significant improvement after use of bronchodilators, and he "likely" had COPD. R. 273, 292. Albert was assessed with COPD that month, and he reported improvement with Symbicort. R. 270. In August, Albert was diagnosed with hypertension, anxiety, and COPD, R. 464, and he continued to have some peripheral edema in his legs on exam, R. 470. In November, Albert reported that he had experienced left shoulder pain and back pain for years, and he had shortness of breath, knee pain, sciatic nerve pain, and right leg numbness and tingling. R. 450–51. Exam revealed peripheral edema, mild tenderness to palpation on paraspinal muscles, and decreased range of motion. R. 455; *see also* R. 456 (lumbar X-ray revealing no fracture or dislocation, "moderate" loss of disc space height at T11-T12, "mild" loss of disc space height at L3-L4, multilevel osteophyte formation, and posterior facet arthropathy); R. 457 (shoulder X-ray revealing no fracture or dislocation, "mild" degenerative changes involving left acromioclavicular joint). Albert continued to make similar complaints until at least April of 2020. *See* R. 431–38, 540–43, 589–92, 593–97.

2.    *Opinion Evidence*

8

The DDS medical records reviewers found that the record contained insufficient evidence of Albert's reported medical conditions during the period between his original AOD and DLI. R. 58, 66.

In January 2020, Dr. James completed a Treating Source Statement regarding Albert's physical conditions. *See* R. 422–25. She said she had treated Albert every one to three months for about a year, and she listed diagnoses of hypertension, COPD, anxiety, chronic back pain, and chronic left shoulder pain. R. 422. Dr. James opined that Albert would be "off task" more than twenty-five percent of the workday and would likely miss more four or more days of work per month. *Id.* He could occasionally lift/carry ten pounds or less and never carry more than ten pounds because of his lumbar and shoulder problems, could sit for eight hours total in and an eight-hour workday, could stand for four hours total in an eight-hour workday, and required a sit/stand option at will. R. 423. Dr. James also found that Albert could rarely climb ladders and scaffolds, stoop, kneel, crouch, and crawl and that he could "never" be exposed to pulmonary irritants, extreme heat, and extreme cold. R. 425.

Also in January 2020, Matt Mildonian, N.P., completed a Treating Source Statement regarding Albert's physical condition. *See* R. 530–33. He had treated Albert since July 2019, and his diagnoses included "severe" COPD, asthma, "mild" restrictive lung disease, and tobacco dependence. R. 530. He opined that Albert would be "off task" more than twenty-five percent of the workday, he could maintain attention and concentration for fewer than fifteen minutes before requiring a break because of his symptoms, and he would miss four or more days of work per month. R. 530. NP Mildonian said Albert's "severe" COPD made it so that "any exertion aside from standing [and] walking short distances at a normal pace" would produce "significant symptoms." R. 531. Additionally, he found Albert had "environmental limitations" on

"continuous[]" exposure to humidity and wetness, pulmonary irritants, extreme cold, and extreme heat. *See* R. 533.

    *3.*    *Albert's Statements*

Albert submitted a Function Report to DDS in August 2019. *See* R. 212–18. He said his breathing and COPD had gotten worse, and his impairments woke him up several times a night and made it so that he could sleep for only two to three hours at a time. R. 213. He could tend to his personal care, but it took longer, *id.*; he made simple meals daily, R. 214; he cut his grass on a riding lawn mower for an hour once a week, *id.*; and he swept the floor for ten minutes, *id.* He shopped in stores once a week for thirty minutes, R. 215, could lift twenty pounds, R. 217, and could walk twenty-five feet before needing to rest for five minutes, *id.*

Albert testified at an administrative hearing before ALJ Munday in July 2020. *See* R. 30–51. Albert said that during 2018, he had been unable to lift much, sitting and standing caused pain, and he experienced sciatic nerve problems radiating down his leg and causing numbness. R. 39–40. His ability to sit and stand was "variable," he could sit for "maybe" an hour before needing to get up and move around, and he needed to lean on something or sit when his leg got numb. R. 40. He could stand stationary for "maybe" twenty minutes, and he could walk ten to fifteen steps before he needed to stop and catch his breath. R. 42.

## B.    *The ALJ's Decision*

ALJ Munday found that Albert suffered from medically determinable impairments of obesity, supraglottic edema/airway obstruction status post 2016 surgeries, COPD, hypertension, and obstructive sleep apnea. R. 21. Albert did not have any "severe" impairments, however, because he "did not have an impairment or combination of impairments that significantly limited his ability to perform basic work activities" during the relevant period. R. 22.

10

In making this finding, ALJ Munday summarized Albert's subjective statements about his symptoms,[5] summarized the medical evidence of record, and evaluated the opinion evidence of record, R. 23–24. In discussing the medical evidence, the ALJ recognized that Albert had "a history of supraglottic edema and airway obstruction post surgeries," but noted that "there [were] no treatment records from June 2017 until January 2019." R. 23. The ALJ then discussed that after January 2019, the record demonstrated evidence of sleep apnea and breathing problems, but she found that "the evidence simply [did] not support that [Albert's COPD and sleep apnea] were severe during the period at issue." *Id.* Further, although imaging of Albert's spine showed some abnormalities, "given that th[o]se complaints and findings [were] from more than a year after the claimant's date last insured, there simply [was] not evidence to support a finding that they relate[d] back to the period at issue." *Id.*

In evaluating the opinion evidence of record, ALJ Munday summarized Dr. James's findings and concluded Dr. James's opinion was "not persuasive," reasoning that it was "from more than a year after the period at issue, [Dr. James] did not treat [Albert] during the period at issue, and th[e] level of limitation [was] not consistent with the treatment notes and other evidence." R. 24. Next, the ALJ noted NP Mildonian's findings and likewise found his opinion was "not persuasive" because it was "from more than a year after the period at issue, [NP Mildonian] did not treat [Albert] during the period at issue," and the "level of limitation [was] not consistent with the treatment notes and other evidence," which demonstrated that Albert "had recovered well from his supraglottic airway obstruction in 2016, had returned to work in construction without any significant issues prior to his amended alleged onset date of disability,

---

[5] "Symptoms" are the claimant's own description of his or her medical impairment. 20 C.F.R. § 404.928(a).

11

and did not receive any treatment for respiratory impairments during the period at issue." *Id.* ALJ Munday found that the DDS reviewers' opinions that there was insufficient evidence to evaluate Albert's claim were "not persuasive" because Albert "had ample time to provide evidence and it appear[ed] he simply did not receive any treatment during the brief period at issue," and the evidence Albert submitted from after his DLI did "not support the presence of any severe medically determinable impairments during the period at issue." *Id.*

ALJ Munday also considered Albert's subjective allegations regarding the severity of his symptoms. She found that Albert's "medically determinable impairments could have reasonably been expected to produce the alleged symptoms," but that his "statements concerning the intensity, persistence, and limiting effects of th[o]se symptoms [were] not entirely consistent" for the reasons explained elsewhere in her decision. R. 23.

ALJ Munday reasoned that Albert's alleged symptoms were "inconsistent because the degree of severity alleged lack[ed] support and consistency with the other evidence of record." R. 24. Specifically, Albert "ha[d] not received treatment during the period at issue," the treatment he received before his AOD "appear[ed] to have allowed him to return to construction work with minimal issues," and after his DLI, Albert's treatment was "routine and conservative overall." *Id.* Additionally, "physical examinations from June 2017 and January 2019 (both outside the period at issue) failed to demonstrate any significantly abnormal findings that would substantiate the presence of severe impairments during the brief period at issue." R. 25. ALJ Munday explained that she had "give[n] [Albert] the benefit of the doubt in finding that he had medically determinable impairments of obstruct[ive] sleep apnea and COPD," but that "given the evidence (or lack thereof), there [was] not support for a finding that any of [Albert's]

impairments significantly limited [his] ability to perform basic work-related activities during the period at issue." *Id.*

C.     *Analysis*

        1.       *ALJ's Consideration of Post-DLI Evidence*

Albert argues that the ALJ should have evaluated the evidence from the period where the medical records support finding him disabled before September 30, 2018. Pl.'s Supp'l Br. 1. I interpret this as an argument that the ALJ should have concluded that the post-DLI medical records related back to the relevant period. *See id.* ("I feel this decision should be overturned because severe COPD doesn't happen overnight.").

To qualify for DIB, Albert needed to "prove that [he] became disabled prior to the expiration of [his] insured status." *Johnson*, 434 F.3d at 656. Evidence "made after a claimant's insured status has expired [is] not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." *Bird*, 699 F.3d at 340. The Fourth Circuit has "recognized that evidence created after a claimant's DLI, which permits an inference of linkage between the claimant's post-DLI state of health and [his] pre-DLI condition, could be the 'most cogent proof' of a claimant's pre-DLI disability." *Id.* (quoting *Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969)).

Thus, in determining whether post-DLI evidence warrants consideration, an ALJ must "review the evidence for linkage." *Parker v. Berryhill*, 733 F. App'x 684, 687 (4th Cir. 2018). Linkage exists when post-DLI evidence offers some insight into how the claimant's impairments impacted his functional ability before the DLI. *See David H. v. Saul*, No. 4:20cv3, 2021 WL 1232674, at *10 (W.D. Va. Apr. 1, 2021). In *Bird*, for instance, the Fourth Circuit found there was linkage where the post-DLI records "summarized evidence that [the claimant] suffered from

13

severe symptoms of PTSD" before the DLI, "indicated that [his] symptoms . . . had been ongoing since his [pre-DLI] return from military service," and "recounted the ways in which the claimant's symptoms affected his work and social relationships before the DLI." 699 F.3d at 341–42. Thus, because the "substance" of the post-DLI evidence "related to [the claimant's] history of impairments" and "placed [his] symptoms in the context of his work and social activities, drawing a link between his current condition and his [pre-DLI] condition," the ALJ was required to give the post-DLI evidence retrospective consideration. *Id.* By contrast, linkage is not present where the post-DLI evidence does not provide information regarding the claimant's pre-DLI functional limitations. *See Parker*, 733 F. App'x at 687 (finding that the ALJ properly identified no linkage where a post-DLI medical opinion merely noted that the claimant had a "history of significant limitations–function" but provided "no information at all on the history of [his] condition"). An ALJ need not consider post-DLI evidence if she properly concludes that no linkage exists. *Id.* at 687–88.

Here, ALJ Munday discussed the evidence from before Albert's AOD showing supraglottic edema and airway obstruction status post 2016 surgeries, and she noted that after his DLI, starting in January 2019, Albert began to experience issues with sleep apnea and COPD. *See* R. 23. She also observed that there were "no treatment records from June 2017 until January 2019." *Id.* The ALJ found that the post-DLI evidence "simply [did] not support that [Albert's] impairments were severe during the period at issue," and although imaging from 2019 showed remarkable findings in Albert's spine, that evidence was "from more than a year after the claimant's date last insured, [and] there simply [was] not evidence to support a finding that they relate[d] back to the period at issue." *Id.*

Thus, ALJ Munday considered the possibility of linkage, but found that the post-DLI evidence of record did not relate back. First, ALJ Munday noted that much of the medical evidence was from a year or more after Albert's DLI. R. 24. Simply because treatment records or a medical opinion were produced a year or more after the DLI, as in this case, does not mean that those records are not relevant. *See, e.g.*, *Jones v. Colvin*, No. 7:13cv84, 2014 WL 4351607, at *9 (W.D. Va. Sept. 2, 2014) (recognizing that post-DLI opinions may be discounted if created "long after" a claimant's DLI, but finding that a medical opinion that was "rendered a mere twenty months after [Plaintiff's] date last insured" and consistent with other evidence of record "should not be discounted because it was retrospective"); *Binnarr v. Colvin*, 164 F. Supp. 3d 788, 792 n.5 (D.S.C. 2016) (explaining that ALJ's conclusion that evidence created 13 months after Plaintiff's DLI was too remote for retrospective consideration "ignores Fourth Circuit precedent that reports six or seven years after the date of last insured are not too late so long as the report" permits an inference of linkage). Second, ALJ's Munday's analysis did not rely on that fact alone. She noted that prior to Albert's DLI he had recovered from throat surgery, returned to performing construction work, and had normal respiratory effort with no limitations from dyspnea. R. 24–25; *cf. McDilda v. Barnhart*, No. 6:04cv36, 2005 WL 831253, at *5 (W.D. Va. Apr. 8, 2005) ("Absent a showing of significant deterioration, McDilda cannot claim disability based on medical conditions she experienced while working.").

Moreover, Albert's medical providers did not offer any information on the nature or severity of his conditions or any other information that would suggest any linkage between this evidence and Albert's functional capabilities during the relevant period. *Cf. Parker*, 733 F. App'x at 687 ("In short, [the medical source] provided no information at all on the history of [the claimant's] condition and provided no historical context or linkage."). Thus, the ALJ reasonably

determined that the medical evidence did not support finding that Albert suffered from an impairment that caused more than a minimal effect of his functional abilities during the relevant period. *See Brian E. v. Comm'r of Soc. Sec.*, No. 4:17cv49, 2019 WL 1302641, at *4–6 (W.D. Va. Feb. 25, 2019) (affirming step-two denial of benefits), *adopted*, 2019 WL 1304228 (W.D. Va. Mar. 21, 2019).

       2.     *Symptoms Analysis*

       The only evidence that can reasonably be interpreted as suggesting any linkage between the post-DLI evidence of record and Albert's pre-DLI condition are a few of Albert's subjective reports to providers that his condition had been ongoing and worsened in or around 2019. *See* R. 283 ("[H]e does report some shortness of breath all his life and worse since his operation."); R. 275 (reporting sleeping problems that had "been present for years but perhaps is more noticeable or frequent over the past 12 months"); R. 450–51 (reporting back and left shoulder pain for a few years). The ALJ discredited these allegations, citing a variety of reasons that are supported by substantial evidence. R. 24–25.

       The regulations set out a two-step process for evaluating a claimant's alleged symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant." *Craig*, 76 F.3d at 594. Step One is a "threshold" inquiry, at which the "'intensity, persistence, or functionally limiting effects' of the claimant's asserted pain" are not considered. *Id.* Assuming the claimant clears the first step, the ALJ moves on to Step Two. There, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities." *Lewis*, 858 F.3d at 866 (citing 20

C.F.R. §§ 404.1529(c), 416.929(c)).[6] "The second determination requires the ALJ to assess the credibility of [subjective] statements about symptoms and their functional effects," *id.*, after considering all the relevant evidence in the record, 20 C.F.R. § 404.1529(c). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). A reviewing court will uphold the ALJ's credibility determination if her articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)).

ALJ Munday's analysis of Albert's symptoms satisfies this standard. ALJ Munday acknowledged Albert's allegations that he had longstanding lower back issues that affected his ability to lift and made it painful to sit and stand in 2018, he had sciatic nerve problems that would make his left leg numb, he could sit for an hour before needing to stand, and he would need to sit down or lean on something after standing to alleviate swelling in his leg. R. 23. She further noted that he reported being unable to bend over to pick things up, having COPD flare-ups despite using Albuterol and Symbicort, and having limited range of motion in his left shoulder. *Id.*

---

[6] "Basic work activities . . . mean the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(a). They include physical functions like "walking, standing, sitting, [and] lifting," as well as mental capacities for following "simple instructions," exercising judgment, and "dealing with changes in a routine work setting." *Id.* § 1522(b)(1), (3)–(4), (6); *see* R. 22. A medical "impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical and mental ability to do basic work activities," *id.*, for at least twelve continuous months. *See Hazelwood v. Colvin*, No. 3:13cv416, 2014 WL 1911891, at *5 (E.D. Va. May 13, 2014) ("[T]he claimant must show that his severe impairment satisfies the twelve-month durational requirement; otherwise, the ALJ will find that the claimant is not disabled."); R. 22.

ALJ Munday found that Albert's "medically determinable impairments could have reasonably been expected to produce the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [were] not entirely consistent" for several reasons. *Id.* First, Albert had "not received treatment during the period at issue." R. 24. Additionally, the treatment he received before his amended AOD "appear[ed] to have allowed him to return to construction work with minimal issues," *id.*, and after his DLI, Albert's "treatment [was] routine and conservative overall, and [did] not seem to show that there were any significant issues during the period at issue," R. 25. Further, "despite alleging significant functional limitations, physical examinations from June 2017 and January 2019 (both outside the period at issue) failed to demonstrate any significantly abnormal findings that would substantiate the presence of severe impairments during the brief period at issue." *Id.* ALJ Munday thus concluded that "given the evidence (or lack thereof), there [was] not support for a finding that [Albert's] impairments significantly limited [his] ability to perform basic work-related activities during the period at issue." *Id.*

As the ALJ recognized, the record contains no evidence from the relevant period. ALJ Munday reasonably found that Albert's lack of treatment reflected that his symptoms were not as severe as alleged. *See, e.g.*, *Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015) (noting that where the ALJ "finds that the treatment was not as aggressive as one would reasonably think would be employed if the alleged disability were actually [as] severe [as alleged], then it is reasonable for the ALJ to conclude that the conservative treatment bears on the claimant's credibility."). The record also supports that Albert's treatment from his 2016 surgeries allowed him to return to work, R. 331–32, and that his post-DLI treatment was "routine and conservative," *see Gregory v. Colvin*, No. 4:15cv5, 2016 WL 3072202, at *5 (W.D. Va. May 6,

18

2016) ("It was reasonable for the ALJ to characterize [Plaintiff's] course of treatment, consisting of pain medication, physical therapy, and steroid injections, as 'conservative.'"), both of which were properly relied on by the ALJ as bases for discrediting Albert's subjective allegations, *see Dunn*, 607 F. App'x at 273 ("[I]t is appropriate for the ALJ to consider the conservative nature of a claimant's treatment—among other factors—in judging the credibility of the plaintiff."). Additionally, ALJ Munday considered evidence of Albert's post-DLI imaging, but she found that it "failed to demonstrate any significantly abnormal findings that would substantiate the presence of severe impairments during the brief period at issue." R. 25. While imaging showed some findings of "moderate" suprapatellar joint effusion, R. 307–08, lower extremity edema, R. 281–82, 285, remarkable findings on pulmonary functioning, R. 273, 292, and decreased range of motion in his spine and shoulders, R. 455, 457, after Albert's DLI, exam findings were generally unremarkable during that period, *see* R. 281–82, 277, 272–73, 568, 558, 554, 542, 596–97, and the ALJ's determination that such exam findings did not substantiate the level of pain Albert alleged during the relevant period is supported by substantial evidence. *See* 20 C.F.R. § 404.1529(c). .Accordingly, I find that ALJ Munday's evaluation of Albert's alleged symptoms is supported by substantial evidence.

> ### 3.   The ALJ's Decision is Adequately Supported

Lastly, Albert raises a general challenge to the ALJ's finding that he did not suffer from any "severe" medically determinable impairments during the relevant period. "An impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler*, 734 F.2d 1012,

1014 (4th Cir. 1984) (cleaned up). "Ordinarily, this is not a difficult hurdle for the claimant to

clear." *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 474 n.1 (4th Cir. 1999).

Under this standard, I am constrained to conclude that ALJ Munday's finding that Albert

did not suffer from any "severe" impairments during the relevant period is adequately "supported

as a matter of fact and law." *Kenne v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). . The

evidence of record demonstrates that Albert had some trouble breathing and airway issues in

early 2016 and that he underwent procedures in January and February of that year. *See* R. 376,

362–63, 340–41. By March of 2016, however, Albert was "doing great," R. 335, and in June he

was back at work and was not limited by shortness of breath, R. 332. Although some isolated

abnormal findings appeared on exam after this period, *see* R. 331, 329, Albert was "markedly

improved" from his pre-operative state and no longer experienced shortness of breath. The

evidence does not indicate that Albert's issues from 2016 continued past his June 2017 follow up

with Dr. Daniero—the last appointment of record prior to his AOD. And, although the evidence

demonstrates that after January 2019, Albert experienced issues with sleep apnea, knee pain,

shortness of breath, swelling in his legs, lower back pain, and left shoulder pain, R. 285–87, 273,

470, 450–51, aside from his own statements, no evidence indicates that these conditions relate

back to the relevant period. As discussed, however, ALJ Munday considered Albert's allegations

that his post-DLI records are reflective of his condition during the relevant period, and she

rejected them based in part on the lack of corroborating treatment records from the relevant

period and the lack of any indication that those records reflected Albert's functional capabilities

during the relevant period. R. 24 ("[I]t appears [Albert] simply did not receive any treatment

during the brief period at issue and that the evidence from after his date last insured does not

support the presence of any medically determinable impairments during the period at issue.").

The ALJ reasonably determined that this absence of treatment, combined with the absence of any nexus between the post-DLI evidence and Albert's pre-DLI state, undermined his allegations that his impairments were as severe as he alleged during the relevant period. Accordingly, the decision will be affirmed.

IV. Conclusion

For the foregoing reasons, the Court will **GRANT** the Commissioner's motion for summary judgment, ECF No. 19; **AFFIRM** the Commissioner's final decision; and **DISMISS** the case from the Court's active docket. A separate Order shall enter.

ENTER: September 22, 2022

Joel C. Hoppe
United States Magistrate Judge